## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Theran Stai,

                Plaintiff,

v.

Todd Deshane, *et al.*,

                Defendants.

Civ. No. 14-4152 (RHK/LIB)

**MEMORANDUM OPINION
AND ORDER**

---

William L.H. Lubov, Lubov & Associates, LLC, Golden Valley, Minnesota, for Plaintiff.

Stephanie A. Angolkar, Jon K. Iverson, Jason M. Hively, Iverson Reuvers Condon, Bloomington, Minnesota, for Defendants.

---

## INTRODUCTION

This action arises out of Plaintiff Theran Stai's incarceration at the Beltrami County Jail (the "Jail") in 2013. Stai alleges that several Jail officials and Beltrami County (the "County") were deliberately indifferent to his mental-health needs, leading to an assault by another inmate at the Jail. He further alleges Defendants failed to appropriately provide for his medical care and safety following the assault. Presently before the Court is Defendants' Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion.

## BACKGROUND

On June 29, 2013, three Bemidji police officers were dispatched to the home of Leaphie Eckley, Stai's former girlfriend. When officers arrived, they noticed her garage

had been converted into a living area for Stai, complete with a couch, table, and shelving. Stai was well-known to law-enforcement officers in the area, having been arrested and booked into the Jail dozens of times after 1989. He was diagnosed with schizophrenia in 2006 and was civilly committed in Washington County, Minnesota, for six months in 2012; he returned to the Bemidji area, where he had grown up, shortly after being released from civil commitment.

Eckley's daughter, Susan Ambrosier, reported that Stai had been starting fires in the garage and injecting something into his hand; an officer observed a fire burning just outside the garage and a container smoldering on a table inside. Officer Karson Otness thought Stai was acting strangely, and he believed Stai was under the influence of something. When he asked about Ambrosier's report of injections, Stai produced an illegal hypodermic needle. As a result, and because the officers believed Stai was intoxicated, they arrested him and transported him to the Jail to allow him to "sober up."

Booking officer Michal Chard met with Stai at the Jail to complete an intake questionnaire. Stai told Chard he was taking medication but would not say what type it was; he denied any mental health issues. Chard filled out a "housing assessment form," checking off boxes labeled "intoxicated" and "other," next to which he typed "suspected drug use," and he designated Stai for placement in "special housing," segregated from the Jail's general population. According to Jail policy, within 72 hours of an inmate being placed in special housing, the Jail Administrator (Defendant Cynthia Borowski) or her designee is to review the circumstances surrounding the segregation and determine whether continued segregation is appropriate. There is no evidence that happened here.

- 2 -

Instead, on July 3, 2013, Stai was moved from the Jail's segregation area to Unit 111, part of the Jail's general population.[1]  Two days later, a health screening was performed by a nurse employed by MEnD Correction Care ("MEnD"), the entity with which the Jail has contracted to provide medical care to its inmates.  The nurse noted on her assessment that Stai had diagnoses of "schizo, bipolar" and that he was receiving supplemental security income (SSI) for "mental health," and she referred him for a full mental-health evaluation.  Shortly thereafter, Stai was prescribed Risperdal, an anti-psychotic medication, to be distributed by Jail staff.  Stai began taking the medication once a day; the dosage was later increased to twice a day.  Eventually, however, he decided to stop taking the Risperdal.

On July 17, 2013, MEnD therapist Linda Pantzke performed Stai's mental-health assessment.  She found him to be acting "very bizarre," with an "incongruence of mood and affect [and] inappropriate laughter."  She noted on an evaluation form that he was displaying active psychotic symptoms, and she recommended that his dose of Risperdal be increased.  Pantzke testified in her deposition, however, that she discussed her findings only with MEnD nurses and Dr. Paul Carey, a MEnD physician, and not Jail staff.[2]

---

[1] In the interim, a backpack found in Eckley's garage was determined to contain methamphetamine, and Stai's charges were upgraded.  A Beltrami County District Judge set Stai's bail at $30,000, but he was unable to post that amount and remained incarcerated.

[2] Stai asserts that Pantzke "faxed the MEnD mental health assessment form to" the Jail (Mem. in Opp'n at 15) and intimates Defendants therefore must have been aware of his diagnoses.  But Pantzke testified in her deposition that she faxed the assessment to the Jail's "medical office, the MEnD clinical office."  (Pantzke Dep. at 20.)  There is nothing in the record to suggest anyone at the Jail *other than MEnD staff* received the assessment or reviewed it.

On July 19, 2013, Stai's criminal-defense attorney petitioned the Beltrami County District Court to evaluate Stai's mental state and capacity. The attorney, who had represented Stai in the past, noted that she had met with Stai twice in connection with his then-pending charges and that he was acting differently than before, offering "rambling" responses to questions that had "themes but no connection to [the] conversation or his case." The Beltrami County Court granted the petition on July 23, 2013. Four days later, the court-appointed examiner, Dr. Charles Chemielewski, went to the Jail to evaluate Stai, but Stai refused to meet with him. Chemielewski tried again approximately one month later, but Stai again refused to meet with him. Chemielewski eventually completed his evaluation on August 28, 2013, using records he received from MEnD, the Social Security Administration, and other sources. He noted that Stai suffered from schizophrenia and bipolar disorder and that it was unlikely he could meaningfully participate in his defense to the charges against him. On September 6, 2013, Beltrami County District Judge Paul Benshoof adopted Dr. Chemielewski's findings, determined that Stai was not competent to stand trial, and ordered the County to immediately file a petition for his civil commitment.

In the meantime, on August 17, 2013, Defendant Todd Deshane, a Jail sergeant, changed Stai's housing from Unit 111 to the "D-Block," another general-population section, after he (Stai) was involved in a verbal altercation with another inmate. Deshane did not review Stai's Jail intake questionnaire before changing his housing assignment. Stai remained housed in the D-Block without incident until September 10, 2013. That day, several other inmates began taunting him. When Stai confronted them, one of the

inmates punched him in the face.  Stai reported to Deshane that he had been injured at approximately 2:50 pm, although he claimed he had slipped and fallen because he did not want to "tell on anybody."  Deshane contacted MEnD nurse Rocco Melhus, who evaluated Stai.  Both doubted whether Stai had actually injured himself in a fall, and Melhus determined that Stai's injuries warranted treatment at a hospital.

A Jail officer transported Stai to Sanford Medical Center in Bemidji, with Melhus following behind.  There, hospital staff determined that Stai's jaw was broken, and it was recommended that he be transferred to Hennepin County Medical Center ("HCMC") for surgery.  Melhus telephoned Deshane to advise him of this development.  Deshane, in turn, attempted to contact Borowski and Defendant Laura Pogreba, the Jail's Assistant Administrator, to inquire about furloughing Stai for treatment, but he was unable to reach either.  He then called Defendant Ernie Beitel, the Chief Deputy Sheriff for Beltrami County, and informed him of the situation.  Beitel knew Stai could be furloughed for medical reasons but he had never previously been involved in a furlough request, which would have to be approved by a judge.[3]  Deshane provided information to Beitel about the nature of Stai's injuries, his pending criminal charges, his last court appearance, and the like.  Beitel then attempted to reach Judge Benshoof, but he was unsuccessful.

Beitel next contacted Beltrami County District Judge John Melbye.  He explained that Stai had been injured and needed to be transported to HCMC, and he provided information about the nature of the charges pending against Stai.  Judge Melbye ordered

---

[3] Several years earlier, the Beltrami County District Court had issued a Standing Order regarding furlough requests.  Beitel, however, testified in his deposition that he had never seen the Order and did not review it when Deshane contacted him.

Stai released from custody with a notice to appear in court on a future date.  Stai was then transported by ambulance to HCMC, where he underwent surgery on September 11, 2013, and was released the following day.  An HCMC social worker arranged for him to receive a bus ticket back to Bemidji, but Stai missed the bus because "voices in his head" told him to walk back to Bemidji.  He spent the next few days walking northwest along various roads and highways until he reached Walker, Minnesota; there, he called a friend to pick him up.  During his lengthy walk, Stai developed an infection in his surgically-repaired jaw, necessitating another surgery that resulted in the loss of several of his teeth.

Once he returned to Bemidji, Stai purchased a tent and lived in the woods.  He did not attend the court date set by Judge Melbye, and a warrant was eventually issued for his arrest.  Stai was arrested at a friend's home on October 20, 2013; he was later civilly committed.

On October 6, 2014, Stai commenced this action against the County and five individuals:  Deshane, Borowski, Pogreba, Beitel, and County Sheriff Phil Hodapp (collectively, the "Individual Defendants").  He alleges the Individual Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  He further alleges the County is liable under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), for failing to adequately train Jail employees to handle mentally-ill inmates and for failing to enact policies or procedures to ensure the well-being of such inmates.  Finally, he alleges all Defendants were negligent in their handling of his mental-health needs and in the wake of the assault on September 10, 2013.  With discovery complete, Defendants now move for

summary judgment on all of Stai's claims.  The Motion has been fully briefed, the Court

heard argument on March 15, 2016, and the Motion is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528

F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I.        The Individual Defendants

The Individual Defendants argue they are entitled to qualified immunity on Stai's

claims.  In analyzing that assertion, the Court must conduct a two-part inquiry:  do the

facts alleged, when viewed in the light most favorable to Stai, show the challenged

conduct violated a constitutional right?  If so, was that right clearly established on the

date in question?  See, e.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir.

2004).  The Court may determine, in its discretion, which of these two questions to

answer first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The constitutional right under consideration here is the right to be free from cruel

and unusual punishment.  There is no dispute it was clearly established, at the time in

question, that "deliberate indifference" to a prisoner's serious medical needs violates the

Eighth Amendment's prohibition against cruel and unusual punishment.  See, e.g., Estelle

v. Gamble, 429 U.S. 97, 104 (1976); Vaughn v. Greene County, Ark., 438 F.3d 845, 850

(8th Cir. 2006).[4]  The only question, therefore, is whether Stai has proffered sufficient

evidence to create a genuine issue that the Individual Defendants' conduct was

deliberately indifferent to his serious medical needs.  The Court must consider each

Individual Defendant's conduct separately – "[l]iability for damages for a federal

constitutional tort is personal, so each defendant's conduct must be independently

assessed."  Heartland Academy Cmty. Church v. Waddle, 595 F.3d 798, 805-06 (8th Cir.

2010) (citation omitted).

"Deliberate indifference has both an objective and a subjective component."

Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).  The objective component requires

---

[4] Stai, of course, was a pretrial detainee and not a convicted prisoner, and hence his claims are
more accurately analyzed under the Fourteenth Amendment's Due Process Clause.  See, e.g.,
Holden v. Hirner, 663 F.3d 336, 341 (8th Cir. 2011).  "This makes little difference as a practical
matter, though:  [p]retrial detainees are entitled to the same protection under the Fourteenth
Amendment as imprisoned convicts receive under the Eighth Amendment."  Kahle v. Leonard,
477 F.3d 544, 550 (8th Cir. 2007); accord, e.g., Jackson v. Buckman, 756 F.3d 1060, 1065 (8th
Cir. 2014) ("Although [a pretrial detainee's] claim is rooted in the Fourteenth Amendment, we
apply the deliberate-indifference standard that governs claims brought by convicted inmates
under the Eighth Amendment.").

a plaintiff to demonstrate he suffered from an objectively serious need.  E.g., Grayson v.

Ross, 454 F.3d 802, 808 (8th Cir. 2006); Moore v. Jackson, 123 F.3d 1082, 1086 (8th

Cir. 1997).  The subjective component requires a plaintiff to show that the defendant

actually knew of, but disregarded, that need.  E.g., Grayson, 454 F.3d at 808-09.  This

means the prisoner must show "more than negligence, more even than gross negligence."

Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008).  This is because

deliberate indifference is "akin to criminal recklessness, which demands more than

negligent misconduct."  Id. (internal quotation marks and citations omitted); accord, e.g.,

Saylor v. Nebraska, 812 F.3d 637, 644 (8th Cir. 2016) ("The subjective prong of

deliberate indifference is an extremely high standard.").

Here, Stai argues the Individual Defendants were deliberately indifferent in two

ways:  first, by placing him, a mentally-ill man, in the Jail's general population, and

second, by furloughing him without properly accounting for his mental-health status.

(See Mem. in Opp'n at 25.)  The Court considers these allegations in turn.

### A.      Placement in the general population

Prison officials must take reasonable steps to ensure the well-being of prisoners,

and the failure to do so may constitute deliberate indifference.  E.g., Farmer v. Brennan,

511 U.S. 825, 832-33 (1994).  To make out such a claim, a plaintiff must proffer

sufficient evidence to show (i) "the conditions that result from the failure to protect the

inmate . . . pose[d] a substantial risk of serious harm," and (ii) the prison official acted

with a "sufficiently culpable state of mind, that is, [was] deliberately indifferent to [that]

substantial risk of serious harm."  Lenz v. Wade, 490 F.3d 991, 995 (8th Cir. 2007).  This

comprises the objective and subjective components of the claim – the plaintiff must show the challenged conduct *objectively* posed a serious risk of substantial harm, and he must also show the official in question *subjectively* acted with deliberate indifference to it. E.g., Walls v. Tadman, 762 F.3d 778, 782 (8th Cir. 2014).

At the outset, it is unclear from Stai's Memorandum *which* Individual Defendants he claims were deliberately indifferent by changing his housing assignment from segregation to the general population. For example, Stai makes no mention of housing when discussing Beitel, instead addressing only the furlough when discussing him. (See Mem. in Opp'n at 31-32.) This lack of specificity makes his claim tricky to analyze.

But there is a likely reason for Stai's imprecision: the record does not indicate that *any* Individual Defendant was involved in the decision to move him from segregation to the Jail's general population. Indeed, Stai's brief is cagey on the issue, noting only that he "*was moved* from segregation to Unit 111 on July 3, 2013," without identifying *who* initiated or authorized that move. (Mem. in Opp'n at 14 (emphasis added).) Furthermore, Deshane testified in his deposition that "anybody in the jail can make decisions about housing." (Deshane Dep. at 20.) Stai offers no evidence to the contrary, or any other evidence indicating the Individual Defendants were involved in the decision. To conclude the Individual Defendants were involved would be to resort to speculation.[5]

In an attempt to overcome this evidentiary gap, Stai appears to contend the Individual Defendants are liable simply because they are supervisory Jail officials, tasked

---

[5] At points in his brief, Stai appears to argue the decision to move him to the D-Block on August 17, 2013, also was unlawful. There is no evidence in the record, however, that anyone other than Deshane (who is discussed in more detail below) was involved in that decision.

with overall responsibility for inmate safety.  (See, e.g., Mem. in Opp'n at 28-29 (arguing Borowski's responsibilities "included providing for the care and safety of all [Jail] prisoners"); id. at 31 (arguing Beitel was "responsible for the supervision of all [Jail] personnel").)  But it is clear that liability for an unconstitutional act cannot be established using the doctrine of *respondeat superior*.  E.g., Livers v. Schenck, 700 F.3d 340, 355 (8th Cir. 2012).  This defect alone causes Stai's claim to die on the vine.[6]

In any event, in order to satisfy the subjective component of this claim, Stai must proffer evidence demonstrating that each Individual Defendant knew of his mental health status and the threat it posed to his safety, but recklessly (or intentionally) disregarded it by transferring him to the general population.  See, e.g., Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998) ("[D]eliberate indifference . . . requires proof of a reckless disregard of [a] *known* risk.") (emphasis added).  Stai acknowledges this in his brief. (See Mem. in Opp'n at 26.)  And it is here that his claim falters, because the evidence

---

[6] A supervisor *can* be found liable for an unconstitutional act when he "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; [and] (3) failed to take sufficient remedial action [that] proximately caus[ed] injury."  Livers, 700 F.3d at 355 (internal quotation marks and citations omitted).  It is unclear whether Stai is raising such a claim here – while he notes the Minnesota Department of Corrections had previously cited the Jail for failing to have adequate policies in place regarding the segregation of mentally-ill inmates, he stops short of arguing this shows "tacit authorization" of the decision regarding his housing status.  Yet, even if Stai were attempting to make out a claim based on this evidence, it would be unavailing.  It is not enough to show there was a "generalized threat" of danger from moving mentally-ill inmates into the general population.  Rather, Stai must show that *he* was exposed to a risk of harm by being moved to the general population.  Hott v. Hennepin Cnty., Minn., 260 F.3d 901, 905 (8th Cir. 2001) ("The inadequate medical care analysis focuses on the particular risk . . . posed by the specific prisoner, rather than on the generalized threat . . . among the population of prisoners as a whole.").  That would be difficult for him to do here, given that he had been housed without incident in the general population on several previous stays at the Jail, and he resided in the general population for over two months before the assault on September 10, 2013.

falls short of creating a genuine issue that any Individual Defendant knew Stai suffered from mental-health problems.

Initially, the record is devoid of evidence indicating that Hodapp, Beitel, or Pogreba had any awareness of Stai's psychological issues before his transfer out of segregation. All denied in their depositions that they knew anything about Stai's mental state in 2013 or his diagnoses of schizophrenia and bipolar disorder, and Stai points to no evidence to the contrary – or any evidence suggesting these supervisory officials even *knew he was being held at the Jail at that time*. Indeed, his argument is aimed almost entirely elsewhere – Stai asserts that his "bizarre behavior" had been "evident for months to MEnD employees, [his] defense counsel, the Court Appointed [] Examiner, [and] a District Court Judge" (Mem. in Opp'n at 25), a group *not* including *any* of the Individual Defendants. And while he does assert that unnamed Jail "staff" were aware of his "bizarre" behavior, he nowhere specifies which Jail employees supposedly were aware of it, or why. For instance, he points to no evidence suggesting that these Defendants were aware of Pantzke's evaluation or Judge Benshoof's finding that he was incompetent to stand trial. Nor does he attempt to explain what supposedly constituted his "bizarre behavior," and in fact the record contains no indication that Jail staff believed Stai was acting "bizarrely" before being placed in the general population.

Stai responds that various pieces of information regarding his health, such as the intake questionnaire and the MEnD mental-health evaluation, were within the "control" of these supervisory officials. (Id. at 30.) Defendants dispute having access to much of that information, but regardless, Stai points to nothing to suggest *Hodapp*, *Beitel*, or

*Pogreba* actually reviewed any of the information or would have been expected, either by legal duty or by the nature of their positions, to review the information at any point, let alone before a change in housing status.[7]  Instead, Stai is attempting to argue that these officials *should have* known about his mental-health problems, based on information available to them.  This simply will not suffice, for it establishes (at most) only negligence, not deliberate indifference.  See Farmer, 511 U.S. at 838 (official cannot be liable for the "failure to alleviate a significant risk that he *should have* perceived but did not") (emphasis added).

To be sure, the Supreme Court recognized in Farmer "that knowledge may be inferred when a risk is so obvious that a reasonable person would recognize it."  Vaughn v. Gray, 557 F.3d 904, 909 n.5 (8th Cir. 2008) (Kyle, J., sitting by designation).  Put another way, "a factfinder may determine that a defendant was actually aware of a serious" risk "from the very fact [it] was obvious."  Id. at 909 (quoting Farmer, 511 U.S. at 842).  But while Hodapp's, Beitel's, and Pogreba's denials that they knew about Stai's ailments do not automatically carry the day, here Stai points to no "objective evidence to the contrary" in the record.  Id. at 908.  There is simply nothing indicating that these Defendants had any interactions with Stai, or any knowledge of his condition, in 2013

---

[7] Stai argues that "concerns regarding an inmate's well-being[] or health would have been brought to" Pogreba's attention (Mem. in Opp'n at 30), but he cites no evidence in the record to support that assertion.  In fact, he appears to contradict himself when later asserting (again without citation) that concerns about an inmate's well-being would be brought to *Borowski*.  (Id. at 28-29.)  Nor does Stai cite any evidence that Pogreba *actually* was informed about concerns with his mental health.

that would have suggested an "obvious" risk by moving him to the general population. The Court perceives no constitutional violation as to these three Defendants.

As for Deshane, Stai points to the following: (1) on July 1, 2013, he made a note that Stai was refusing to move to another section of the Jail; (2) he was the shift supervisor on July 5, 2013, when the MEnD nurse determined Stai required a mental-health evaluation; and (3) he had access to Stai's subsequent mental-health assessment. (Mem. in Opp'n at 27.)  In the Court's view, this evidence also falls short of indicating Deshane knew of, but deliberately disregarded, Stai's mental-health issues.  The July 1 note, for example, says nothing about the *reasons* Stai did not want to move, and certainly it does not suggest on its face that mental illness or safety fears were his overriding concerns.  The note provides only that Stai "refused Court + to move," which could have been for any number of reasons, including simply malingering.  Moreover, while Deshane was the shift supervisor when the MEnD evaluation was performed, there is no evidence in the record that he was informed of the results of the evaluation, and Stai points to nothing suggesting the evaluation should have been placed in his Jail file – indeed, the evidence stands unrebutted that MEnD *separately* maintained medical records for inmates, due to privacy concerns.[8]  All told, he has not cited evidence creating a

---

[8] Stai points out that Deshane testified in his deposition that Unit 111 typically housed only inmates who were either mentally ill, low-level sex offenders, or "trustees" (trusted inmate workers), and he knew that Stai was neither a sex offender nor a trustee.  The implication, then, is that Deshane should have realized Stai was mentally ill simply from being housed in Unit 111, and hence he should not have subsequently permitted Stai to be transferred to the D-Block.  But it is not enough to show that Deshane *could have* inferred this; Deshane must have actually drawn that inference.  Montgomery v. City of Ames, 749 F.3d 689, 695 (8th Cir. 2014) ("Deliberate indifference requires both that the official be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and that the official

genuine issue that Deshane knew he was suffering from mental illness requiring his separation from the general population.[9]

The evidence is at least somewhat more compelling with respect to Borowski. Although Stai again points unconvincingly to her (alleged) access to his mental-health records, he also notes two key additional facts: (1) Stai's sister called Borowski at some point prior to 2013 and sought her assistance in having Stai civilly committed; and (2) Borowski observed the daily medication passes and, hence, it was (or should have been) obvious to her that Stai was not taking the prescribed Risperdal. (Mem. in Opp'n at 28-29.) In the Court's view, however, these facts do not change the result. The failure to take medicine is not necessarily suggestive of mental illness – indeed, the record indicates that it was not uncommon for inmates to refuse medication. (Borowski Dep. at 64-65, 93.) Furthermore, Borowski is not a medical doctor, and nothing in the record suggests she was aware of the particular medication that had been prescribed for Stai or what it was used for. As for the telephone call from Stai's sister, Borowski could not recall when she received it, other than it coming "years ago." (Id. at 84.) In the absence

---

*actually draw that inference*.") (emphasis added) (internal quotation marks and citation omitted). And here, the evidence is lacking that Deshane concluded either that Stai was suffering from mental illness or that he believed a move from Unit 111 to the D-Block, *both of which were in the general population* (Deshane Dep. at 14, 65), would pose any risk of harm to Stai.

[9] Stai also argues, in passing, that Deshane was deliberately indifferent by failing to ensure well-being checks were performed every fifteen minutes, as required by Jail policy for inmates with mental-health problems. (Mem. in Opp'n at 27.) But this allegation fails for the same reason: the record does not create a genuine issue that Deshane was aware of Stai's mental-health issues. Furthermore, "[t]he failure to conduct [] cell checks . . . is negligence of the purest form," insufficient to show *deliberate* indifference. Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013).

of more temporal specificity, this evidence is simply too attenuated to create a genuine

issue that Borowski was aware of Stai's mental-health problems in 2013.

At oral argument, Stai also contended that Borowski was liable because she

violated Jail policy by not determining, prior to Stai being moved from segregation to

Unit 111, whether continued segregation was appropriate.  Indeed, this was a recurring

theme in Stai's argument, namely, that the Jail had several policies Borowski and other

Individual Defendants failed to follow.  But while the failure to follow policies or

procedures is no reason for commendation, it does not suffice to show deliberate

indifference.  E.g., Luckert v. Dodge Cnty., 684 F.3d 808, 819 (8th Cir. 2012) ("Failure

to follow written procedures does not constitute *per se* deliberate indifference.  If this

were so, such a rule would create incentive for jails to keep their policies vague, or not

formalize policies at all.").  Stated differently, Borowski's failure to follow policies or

procedures shows, at most, *inadvertent* or *negligent* conduct.  But Stai must offer more –

he must proffer evidence indicating that Borowski acted with *deliberate* indifference.  As

already noted, this is a particularly stringent burden, because deliberate indifference

requires "a highly culpable state of mind approaching actual intent."  Choate v. Lockhart,

7 F.3d 1370, 1374 (8th Cir. 1993).  And while there is some evidence here that the Jail

was instructed by the Minnesota Department of Corrections in 2010 – three years before

the events in question – to implement policies regarding inmate housing and

classification, it is undisputed the Jail *did* implement such policies; at most Stai has

shown Borowski failed to comply with them.  On the evidence proffered, the failure to do

so does not, in this Court's view, create a genuine issue on deliberate indifference.  See

Luckert, 684 F.3d at 819 (favorably citing Minix v. Canarecci, 597 F.3d 824, 828-29, 833 (7th Cir. 2010), for the proposition that a nurse's decision to remove an inmate from suicide watch and medical segregation, despite knowing the inmate had twice attempted suicide, showed poor judgment but not deliberate indifference).[10]

At bottom, it is "deceivingly inviting to take the [assault], *ipso facto*, as conclusive proof of deliberate indifference." Rellergert *ex rel.* Rellergert v. Cape Girardeau Cnty., Mo., 924 F.2d 794, 796 (8th Cir. 1991). But this would be error, for hindsight does not a deliberate-indifference claim make. Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015). "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." Rellergert, 924 F.2d at 797. Here, Stai has failed to show that any Individual Defendant was responsible for his move to the Jail's general population, and even if he had made that showing, the record does not raise a jury question whether the Individual Defendants *knew* of his psychological problems before doing so. Accordingly, he cannot show they were *deliberately* indifferent to his safety.

---

[10] Furthermore, Borowski's failure to review Stai's housing classification occurred when he was first moved from segregation to Unit 111, in early July 2013. But Stai was not assaulted until he was later moved to D-Block – a move that indisputably came for his own protection, in response to his verbal altercation with another inmate – and he points to no evidence that Borowski was (or should have been) involved in *that* decision. Hence, he lacks evidence linking Borowski's alleged failure to comply with procedures to his September 2013 assault.

### B.    Furlough

The crux of Stai's furlough claim is that the Individual Defendants were deliberately indifferent by releasing him for medical care while (supposedly) knowing that he was mentally ill.  There are at least two problems with this claim.[11]

First, as already addressed, the evidence fails to create a genuine issue that any Individual Defendant knew Stai was suffering from mental illness before he was furloughed.  This scuttles the furlough claim for the same reason it scuttles the housing claim:  the Individual Defendants cannot have deliberately disregarded mental-health problems about which they were unaware.

Second, and more importantly, Stai has cited no authority for the proposition that a correctional facility must *not* furlough an inmate for needed medical care when he suffers from mental illness.  Nor is the Court aware of any authority for such a startling proposition.  Taken to its logical conclusion, accepting Stai's argument would mean that any time a mentally-ill individual were arrested, it would be unlawful for the jail to release him – even if ordered to do so by a court – because it would constitute deliberate indifference to his mental-health needs.  This would result in the indefinite detention of mentally-ill individuals with no lawful basis.  Accepting Stai's logic would also put jail officials on the horns of a dilemma where, as here, a mentally-ill inmate is injured:  either release him and run the risk of being sued for doing so (as Stai alleges in this case), or

---

[11] One additional problem is that certain of the Individual Defendants – namely, Borowski, Pogreba, and Hodapp – were not involved in the decision to furlough Stai.  The Court need not address that problem, however, because the furlough claim falters for other reasons.

decline to release him and inevitably be sued for failing to obtain appropriate medical care for the inmate.  The Constitution requires no such Hobson's choice.

Stai also argues that once he was released, he should have been accompanied to HCMC by a Jail staff member to ensure his safe return to Bemidji.  (See Mem. in Opp'n at 25-26 (arguing the Individual Defendants were deliberately indifferent by "abandoning Stai in the community").)  Once again, Stai cites no authority for this proposition, which simply does not comport with logic.  The Eighth Amendment imposes obligations on jail officials because inmates cannot provide for themselves *by virtue of their incarceration*. See, e.g., Deshaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen [a] State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . The rationale for this principle is simple enough:  when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs[,] it transgresses the substantive limits on state action set by the Eighth Amendment.").  Once an inmate is released, however, the obligation to provide medical care necessarily terminates, as the inmate is then able to fend for himself.  See, e.g., Hamilton v. Singleton, No. 4:13-cv-4038, 2015 WL 1004343, at *3 (W.D. Ark. Mar. 5, 2015) ("There is no Eighth Circuit or Supreme Court precedent recognizing a constitutional duty to provide medical care to an inmate after he is released.").  Were it otherwise, jails would become the *de facto* guardians of all mentally-

ill arrestees, even after they were released on bail, paroled, or had completed their sentences. The Constitution's protections simply do not reach that far.[12]

Stai also assails the Individual Defendants for failing to comply with the Beltrami County District Court's Standing Order regarding furlough requests and for allegedly lying to Judge Melbye in order to obtain the furlough. (See Mem. in Opp'n at 25-26.) Whatever may have actually occurred, however, is irrelevant to Stai's claims, which hinge on a constitutional duty that simply does not exist. In the absence of such a duty, the furlough claim necessarily fails.

## II.    Beltrami County

A municipality such as the County is a "person" for purposes of 42 U.S.C. § 1983 and, therefore, may be subject to liability for constitutional violations. E.g., Monell v. Dept. of Soc. Serv., 436 U.S. 658, 690 (1978).[13] Monell liability attaches if a plaintiff can show that the municipality "operates under a policy or custom that unconstitutionally deprive[d] [him] of his . . . rights." Kuha v. City of Minneapolis, 365 F.3d 590, 603 (8th Cir. 2003), overruled on other grounds by Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (en banc).

---

[12] Moreover, although Stai's right to appropriate medical care while incarcerated was clearly established in 2013, the absence of any authority for the proposition that he should not have been furloughed or should have been accompanied to HCMC counsels that the Individual Defendants would be entitled to qualified immunity on such claims. See, e.g., Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") (citation omitted). The Court need not dispose of his furlough claim on that ground, however, as it finds Stai has failed to demonstrate a constitutional violation. See Kahle, 477 F.3d at 550 (if an official did not deprive the plaintiff of a constitutional right, "he does not need qualified immunity, as he is not liable").

[13] Section 1983 is the legal vehicle through which Stai may vindicate his constitutional claims. See, e.g., Goss v. City of Little Rock, Ark., 151 F.3d 861, 864 (8th Cir. 1998).

Here, Stai asserts that the County failed to adequately train Jail employees, failed to enact adequate policies regarding mentally-ill inmates, ignored that the policies actually enacted at the Jail were not being followed, engaged in a consistent pattern of deliberate indifference to the needs of the mentally ill, failed to implement corrective action after the Minnesota Department of Corrections repeatedly noted deficiencies in the Jail's housing-classification system and handling of the mentally ill, and other similar allegations. Whatever merit these assertions might have, they cannot lead to Monell liability because Stai has failed to prove an underlying constitutional violation. The Eighth Circuit "has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 674 (8th Cir. 2007) (quoting McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005)); accord, e.g., Burton v. St. Louis Bd. of Police Commissioners, 731 F.3d 784, 799 (8th Cir. 2013); Cooper v. Martin, 634 F.3d 477, 481-82 (8th Cir. 2011). In the absence of such a showing, the claims against the County cannot stand.

## III.     The negligence claims

For all of the foregoing reasons, Stai's constitutional claims fail, leaving only his negligence claims for resolution. Yet, subject-matter jurisdiction in this action is premised on the existence of a federal claim. (See Compl. ¶ 3.) Jurisdiction over the state-law claims exists solely by virtue of the supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state-law claims forming part of the same "case or controversy" as federal claims. The exercise of supplemental jurisdiction is

- 21 -

discretionary, however, and where all federal claims have been dismissed prior to trial,

"even though not insubstantial in a jurisdictional sense, the state claims should be

dismissed as well."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); accord,

e.g., Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004).

Accordingly, the Court declines to exercise supplemental jurisdiction over Stai's

negligence claims, and it will dismiss those claims without prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 17) is

**GRANTED**.  Stai's federal claims (Counts 1 and 4 of the Complaint) are **DISMISSED**

**WITH PREJUDICE** and Stai's state claims (Counts 2 and 3 of the Complaint) are

**DISMISSED WITHOUT PREJUDICE**.[14]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:  April 28, 2016                                  s/Richard H. Kyle
                                                       RICHARD H. KYLE
                                                       United States District Judge

---

[14] See 28 U.S.C. § 1367(d).